# IN THE UNITED STATES DISTRICT COURT
# FOR SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JACK HERNANDEZ ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Civil Action No. _____ |
| ) | |
| ) | |
| TRANS UNION, LLC, ) | |
| ) | Class Action Complaint |
| in its own name and t/a ) | |
| TRANS UNION RENTAL ) | |
| SCREENING SOLUTIONS, INC. ) | |
| and ) | |
| TRANS UNION RENTAL ) | Jury Trial Demanded |
| SCREENING SOLUTIONS, INC., in its ) | |
| own name, ) | |
| ) | |
| Defendants. ) | |

Plaintiff Jack Hernandez, individually and on behalf of himself and all others similarly situated, files this Class Action Complaint against Trans Union, LLC ("TU"), and Trans Union Rental Screening Solutions, Inc. ("TURRS"), (collectively, "Defendants"). Plaintiff alleges, based on personal knowledge as to Defendant's actions and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. This is a consumer class action under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA"), brought on behalf of rental applicants nationwide who were the subjects of background reports prepared by Defendants. Defendants systematically violate section 1681e(b) of the FCRA by failing to use reasonable procedures to assure the maximum possible accuracy of information included on the tenant screening reports it sells to prospective landlords.

2. Specifically, Defendants violate this fundamental accuracy requirement of the FCRA by inaccurately reporting criminal record information about consumers, including Mr. Hernandez. In each instance, Defendant reported criminal record information that does not pertain to the subject of the report and, which in fact, relates to a different person with an entirely different name.

3. Defendant's inaccurate reporting is the result of its systematic failure to adopt adequate procedures for updating the criminal record information on the tenant screening reports it sells. Despite the public availability of court records that conclusively demonstrate that certain public records have either been expunged, sealed, and/or do not exist, Defendants routinely fail to obtain up-to-date information pertaining to the expungement or existence of pubic record information, and routinely publish harmful, misleading, and inaccurate tenant screening reports to landlords, property managers, property owners, managing agents, and rental agents (collectively "Property Managers") in violation of the FCRA, specifically, 15 U.S.C. § 1681e(b).

4. Aside from Defendant's practices generally disrupting interstate commerce, these practices and inaccurate adverse reports specifically harm consumers seeking residential leases by prejudicing their prospective landlords' decision making ultimately resulting in the denial of housing to these otherwise qualified consumers.

5. Pursuant to 15 U.S.C. §§ 1681n and 1681o, Plaintiffs seek monetary relief for himself and a class and subclass of similarly situated individuals for about whom Defendant reported criminal record information that was inaccurate on the face of the report.

## JURISDICTION AND VENUE

6. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

7. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

8. Plaintiff Jack Hernandez is an adult individual who resides in the Southern District of Florida, and a "consumer" as defined by the FCRA.

9. Defendant TransUnion, LLC ("TransUnion") regularly conducts business in the State of Florida and has a place of business in Boca Raton, Florida.

10. Defendant TransUnion Resident Screening Solutions, Inc. ("TURSS") is a wholly-owned TransUnion subsidiary that regularly conducts business in the State of Florida and has a place of business in Colorado.

10. At all times pertinent hereto, Defendants were "persons" and "consumer reporting agencies" (singular, "CRA") within the meanings of 15 U.S.C. §§ 1681a(b), (f).

11. Defendants Trans Union LLC and Trans Union Rental Screening Solutions Inc. operate as a single consumer reporting agency ("CRA") under the FCRA. Trans Union, LLC has structured itself so as to warehouse its sale of credit reporting consumer reports in one entity, and its sale of criminal history (employment and landlord-tenant purposed) consumer reports in a second entity, its wholly owned subsidiary Trans Union Rental Screening Solutions ("TURSS"). Trans Union has substantial involvement in TURSS operations with respect to the production of the reports that TURSS sells and the disclosure of information to consumers by TURSS.

12. Defendants function as a single, unified CRA, having integrated their ownership, operations, data storage, technical support, information technology services, marketing, quality assurance, auditing, compliance, consumer contact personnel, and oversight efforts.

## FACTUAL ALLEGATIONS

### *Defendants' Acquisition and Use of Criminal Records for Credit Reporting*

13. The FCRA was crafted "to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilizes accurate, relevant,

and current information in a confidential and responsible manner." *Beseke v. Equifax Info. Servs. LLC*, No. 0:17-cv-04971 (DWF/KMM), 2019 WL 6250756, at *3 (D. Minn. Nov. 22, 2019) (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3rd Cir. 2010)).

14. In furtherance of that goal, the FCRA requires credit reporting agencies ("CRAs") such as Defendants to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *See* 15 U.S.C. § 1681e(b).

15. Among other things, the FCRA regulates the collection, maintenance, and disclosure of consumer credit report information by CRAs, including public record information.

16. Trans Union claims that it can offer paying customers "[a] database of more than 200 million files, which profile nearly every market-active consumer in the United States." http://www.transunion.com/corporate/business/solutionsbyneed.page/.

17. Its best-known product is conventional credit reporting. "This database contains information provided by more than 85,000 credit-granting institutions and is updated, audited and monitored on a regular basis." http://www.transunion.com/corporate/business/solutionsbyneed/credit-reporting.page/.

18. Trans Union also maintains marketing websites that it uses to promote its services in providing criminal record background information on tenants and other consumers.

19. For its tenant screening business, Trans Union markets its services as follows:

> It used to be that accurate screening of tenants was available for only large property management companies. But Trans Union changed that with SmartMove – a convenient tenant screening service (https://www.mysmartmove.com/) tailored for property owners who manage properties on a smaller scale. Now property owners can get access to accurate credit, criminal and eviction histories on renters (https://www.mysmartmove.com/), and receive custom leasing recommendations in order to make quicker and better-informed decisions.

*See* http://www.transunion.com/product/smartmove.

20. Further, Trans Union states:

> Our Rental Screening Solutions offer property owners and managers powerful leasing insights that help increase occupancy, cut costs, maximize income and minimize portfolio risk. Our solutions are backed by our own industry-leading data and analytics to ensure you have the best, most accurate information so that you can make informed decisions with complete confidence.

*See* http://www.transunion.com/industry/property-management.

21. TransUnion lists the product highlights of SmartMove as being:

- Straight from the source
- One of three nationwide consumer reporting agencies that track and reports consumer payment histories
- Reliable data
- Maintained and delivered in accordance with the FCRA
- Broad coverage
- Millions of records covering credit, criminal and eviction histories
- More advanced matching
- Advanced matching logic to match your rental applicants to our report histories
- Just for tenant screening
- Report types and formats are specific to helping you decide which rental applicant to choose

*See* https://www.transunion.com/product/smartmove.

22. By their own repeated admissions, Defendants are regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports to third parties.

23. And for many years, Defendants have purchased public records information pertaining to residential eviction litigation ("eviction information") from one or more private vendors instead of retrieving the actual underlying court records themselves—or even more manageable digital representations—for purposes of creating and selling tenant screening reports to landlords and rental property managers.

24. The tenant screening reports that Defendants sell to landlords and property managers about thousands of consumers each year are "consumer reports" within the meaning of 15 U.S.C. § 1681a(d) because they are used and expected to be used for multiple purposes governed by 15 U.S.C. § 1681b and the criminal record information included within bears on the credit history, credit worthiness, reputation, personal characteristics, and mode of living of the subjects of the reports.

25. Each of the TransUnion entities is integrated as a single national consumer reporting agency, with all databases marketed and made available to each of TransUnion's customers regardless of structure or category of content. For example, a tenant screening user can obtain a single report that contains both credit reporting data and criminal history data. Employer customers can receive all of the data in the public records database as well as the conventional credit history data.

26. Accordingly, the Trans Union Defendants operate collectively and jointly as a national "consumer reporting agency," as defined in section 1681a(f) of the FCRA.

27. Defendants are required by the FCRA to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the consumer reports they prepare relates. 15 U.S.C. § 1681e(b).

28. However, Defendants do not follow such procedures, but rather fail to obtain updates to criminal records information, regularly and illegally reporting criminal records information pertaining to cases that have been expunged.

29. Defendants' practices and procedures regarding the reporting of criminal records information, specifically the failure to report the most up-to-date status on these records, causes widespread harm to consumers and interstate commerce as a whole.

30. This phenomenon is the result of Defendants' intentional business decisions. The criminal records information Defendants purchase is merely a summary prepared by its vendors that does not include all the information or the most up-to-date information available at the courthouses where the records themselves are housed in conjunction with the day-to-day functioning of those entities.

31. Defendants know that their vendors make mistakes in the condensed, summary criminal records information that it purchases for credit reporting purposes and that the information routinely does not include the most up-to-date status of the actual cases.

32. Purchasing distilled, incomplete public records information was the impetus for regulatory investigations of TransUnion and other CRAs, and dozens of FCRA class action lawsuits throughout the United States, including in this District.[1]

33. For example, in 2015, the Consumer Financial Protection Bureau ("CFPB") noted that CRAs did not adequately oversee their public records vendors:

> Examiners found that the oversight of public records providers by one or more CRAs was weak and required corrective action. For example, one or more CRAs had never conducted a formal audit of their public records providers. In addition, one or more CRAs did not have defined processes to verify the accuracy of public record information provided by their public records providers. In light of such weaknesses, Supervision directed one or more CRAs to establish and implement suitable and effective oversight of public records providers.[2]

34. Further, the CFPB expressed concern about the accuracy of public records information that the CRAs imported into their consumer databases:

> Examiners reviewed quality control processes with respect to the accuracy of consumer reports produced by one or more CRAs and found that, with certain exceptions, there were no quality control policies and procedures to test

---

[1] *See, e.g., Lustig v. TransUnion, LLC*, Case No. 2:17-CV-01175-GAM (E.D. Pa.) (filed Mar. 16, 2017); *Matthews v. TransUnion, LLC,* Case No. No. 2:17-cv-01825-JS (E.D. Pa.) (filed Apr. 21, 2017).

[2] CFPB, *Supervisory Highlights*, 2.1.1 (Summer 2015), available at http://files.consumerfinance.gov/f/201506_cfpb_supervisory-highlights.pdf (last viewed July 9, 2018).

compiled consumer reports for accuracy. While processes existed to analyze and improve the quality of incoming data, there was no post-compilation report review or sampling to test the accuracy of consumer reports. In light of these weaknesses, Supervision directed one or more CRAs to develop a plan with implementation timelines to establish quality controls that regularly assess the accuracy and integrity of the consumer reports and consumer file disclosures produced.[3]

35. Other regulators, including the New York Attorney General, initiated investigations of the "Big Three," a group of national CRAs that includes TransUnion, Experian Information Solutions, Inc., and Equifax Information Services, LLC, in part due to similar problems with the accuracy and currency of publics records information in credit reports.

36. The Big Three ultimately entered into an agreement[4] with the New York Attorney General that they took to calling the "National Consumer Assistance Plan" ("NCAP").

37. As of July 1, 2017, pursuant to the requirements of the agreement and the NCAP, the Big Three ceased including civil judgment information that did not meet certain minimum standards in credit reports. In practice, this meant that civil judgments disappeared entirely from consumer reports prepared by the Big Three.[5]

38. Early in 2018, TransUnion entered into a national class action settlement of public records-related FCRA claims, which was preliminarily approved on March 23, 2018[6] and finally approved on August 29, 2018.[7]

---

[3] *Id.* at 2.1.2.

[4] SETTLEMENT AGREEMENT, *In the Matter of the Investigation by Eric T. Schneiderman, Attorney General of the State of New York, of Experian Information Solutions, Inc.; Equifax Information Services, LLC; and TransUnion, LLC*, http://www.ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf (last viewed July 9, 2018).

[5] *See* CFPB, *Quarterly Consumer Credit Trends Report*, 2-3 (February 2018) https://www.consumerfinance.gov/documents/6270/cfpb_consumer-credit-trends_public-records_022018.pdf (last viewed July 9, 2018).

[6] *Clark v. TransUnion, LLC*, Case No. 3:15-cv-00391-MHL, Doc. 248 (E.D. Va. Mar. 23, 2018).

[7] *Clark*, Case No. 3:15-cv-00391-MHL, Doc. 272 (E.D. Va. Aug. 29, 2018).

39. Defendants, fully aware of the problems associated with the incomplete and inaccurate information purchased from vendors, have not stopped acquiring, using, and profiting from inaccurate and out-of-date criminal records information.

*Plaintiff's Experience*

40. At all times relevant to Plaintiff's allegations, full case dockets and digital representations of all documents in criminal cases in Palm Beach County, Florida, were available online at no charge.

41. In or about June 2020, Plaintiff Jack Hernandez applied to rent a house in Gaithersburg, Maryland.

42. On or about June 23, 2020 a real estate broker or landlord applied through tenant screening service and report re-seller RentSpree for information in connection with Plaintiff's application for rental housing.

43. RentSpree sold the real estate broker and/or landlord a consumer report containing information provided "directly" from Defendant Trans Union purportedly about Plaintiff on the same day for a fee.

44. The first page of the report, dated June 23, 2020, stated that "All of the information on the screening reports comes directly from TransUnion SmartMove."

45. The report further provided a contact number for TransUnion if any of the information was incorrect.

46. Under the report's 'Summary' it showed that a "Court Action" had been found in Plaintiff's background.

47. The 'Court Action' section of the report stated that a charge of "TRESPASS STRUCTURE OR CONVEYANCE" under Florida criminal statute 810.08(2)(a) had been filed on October 13, 2015.

48. Under 'Charge Disposition' it stated "NOLLE PROSSE," indicating that the prosecutor had voluntarily withdrawn the charge, and a 'Charge Disposition Date' of January 25, 2016.

49. The report was grossly defamatory and inaccurate.

50. It stated that Plaintiff had been criminally charged.

51. In truth Plaintiff's criminal charge had been expunged and should not have reported.

52. Expungement refers to the process of sealing arrest and conviction records. Virtually every state has enacted laws that allow people to expunge arrests and convictions from their records. Though the details can vary from one state to the next, most states' laws provide that once an arrest or conviction has been expunged, it need not be disclosed, including to potential employers or landlords.

53. In February 2018, Plaintiff sought and received an expungement of the charge.

54. As a result of the requested expungement, the Palm Beach County Court expunged the eviction record that same month, as defined under Fla. Stat. § 943.0585, which provides for expungement of a criminal record when "An indictment, information, or other charging document was filed or issued in the case giving rise to the criminal history record, was dismissed or nolle prosequi by the state attorney or statewide prosecutor[.]"

55. Specifically, the eviction record for Plaintiff was removed from publicly accessible records, and ceased to exist moving forward.

56. At all times thereafter, there has been no criminal records associated with Plaintiff.

57. Defendants failed to search for updated public record information on the expunged offense. If they had, they would have become aware of the fact that the charge had been expunged and Plaintiff therefore did not have any criminal charges on his background report.

58. Upon information and belief, Defendants did not conduct any independent search of criminal court records, but rather purchased the data it included in the report from a third-party vendor which it did not review or verify.

59. The report also failed to contain all information pertaining to the source of the public records obtained, including the specific courts and the dates that the information was originally reported or publicized.

60. RentSpree notified the real estate broker and/or landlord and Plaintiff that Plaintiff's application should be rejected. Solely as a result of the derogatory inaccurate information on Defendants' report, Plaintiff's rental application was denied.

61. Defendants knew or should have known that their actions violated the FCRA. Additionally, Defendants could have taken the steps necessary to bring their agent's actions within compliance of these statutes but neglected to do so and failed to adequately review those actions to insure compliance with said laws.

62. At all times pertinent hereto, Defendants were acting by and through their agents, servants and/or employees, who were acting within the scope and course of their employment, and under the direct supervision and control of the Defendants herein.

63. At all times pertinent hereto, Defendants' conduct was a result of its deliberate policies and practices, was willful, and carried out in reckless disregard for consumers' rights as

set forth under section 1681e(b) of the FCRA, and further assumed an unjustifiably high risk of harm to Plaintiff, and consumers across the country.

64. Plaintiff has suffered actual damages, tangible injuries, and intangible injuries as a result of Defendants' false, inaccurate, and wrongful tenant screening report.

65. As a result of Defendants' conduct: (a) Plaintiff was denied housing; (b) Plaintiff incurred monetary loses including application fees; (c) Plaintiff's credit worthiness was negatively impacted, decreasing his ability to obtain lower-cost credit, obtain loans, find a job, and to find housing; (d) Plaintiff had to waste time through multiple phone calls, text messages, and correspondence with the representative for the apartment; (e) Plaintiff had to waste time by review of his apartment records, court records, emails, and credit reports; and (f) Plaintiff suffered emotional distress, including anger, inconvenience, confusion, embarrassment, aggravation, and anxiety.

66. All of Plaintiff's above-referenced injuries – both tangible and intangible – are actual, concrete injuries that are widely recognized by the United States Supreme Court, United States Court of Appeals for the Eleventh Circuit, and the United States District Court for the Northern District of Georgia.

## CLASS ACTION ALLEGATIONS

67. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated, and seeks to certify the following Classes:

   a. Expungement and Failure to Update Class – Nationwide

   *For the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of judgment, all consumers with an address in the United States and its Territories who were subjects of tenant screening reports created by Defendants that contained public record information which had been expunged, sealed or removed from the public record or that did not accurately reflect the current status and/or disposition of the public record information, and*

*for whom Defendants had not verified the public record information with the court within the 30 day period prior to the issuance of the report.*

      b.      Disputed Expungement/Sealed Class

*For the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of judgment, all consumers with an address in the United States and its Territories who: 1) were subjects of tenant screening reports created by Defendants that contained public record information which had been expunged, sealed or removed from the public record; 2) who disputed the public record information with Defendants; and 3) for whom Defendants corrected the public record information, by either removing it from the report or updating it in a way report it as accurate and up to date and accurate.*

68.     The Class and Subclass will be subject to the following exclusions, who are not members of the Classes: (1) Counsel for Plaintiff and the Classes, (2) Counsel for Defendants, and (3) the assigned Judge, Magistrate Judge, and their clerks and staff.

69.     This action has been brought, and may maintained, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure because the Classes satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements under Fed. R. Civ. P. 23(a) and (b) for class certification.

      **1.     Rule 23(a)(1) - Numerosity**

70.     Defendants provide tenant screening reports to thousands of companies throughout the country.

71.     Defendants' tenant screening reports are standardized, form documents, produced pursuant to uniform practices and procedures. Of these tenant screening reports containing criminal records information, many such records have been expunged, sealed, and are nonexistent. Furthermore, Defendant prepares and sends its disclosures to consumers using standardized policies and procedures.

72.     It is plausible Defendants failed to update these reports on such a large scale that

joinder of all in this lawsuit would be impracticable. Although the exact number of the class members is unknown, upon information and belief, the estimated number is in excess of 100 consumers.

73. The identities of all class members are readily ascertainable through appropriate discovery, including but not limited to the business records of Defendants.

### 2. Rule 23(a)(2) - Commonality

74. Common questions of law and fact that exist as to the Classes. These common legal and factual questions include among others:

   a. Whether Defendants provided tenant screening reports that contained criminal records information after such information had been expunged, sealed, or no longer existed;

   b. Whether Defendants' FCRA violations were willful, negligent, reckless, or intentionally carried out in conscious disregard of the class members' rights.

75. The common evidence that will drive resolution of the claims for the Classes is a list of consumers who were the subject of a tenant screening report that contained outdated criminal record information.

### 3. Rule 23(a)(3) - Typicality

76. Plaintiff's claims are typical of the claims of all the other members of the Classes because Plaintiff has the same claims to relief as all other class members. Likewise, Plaintiff's claims are based on the same legal theories as the claims of all the other members of the Classes.

77. The claims of Plaintiff and class members originate from the same conduct, practice, and procedure on the part of Defendants. Thus, the claims of each class member require proof of the same operative facts. Any defenses that Defendants may have to liability or damages with respect to Plaintiff's claims would be generally applicable to all members of the Classes.

### 4. Rule 23(a)(4) - Adequacy

78. Plaintiff brings this lawsuit after an extensive investigation of Defendants' alleged misconduct, with the intention to stop Defendants' unlawful practices, and to recover the same relief for all consumers affected.

79. Because Plaintiff has no interest adverse and/or in conflict to the interests of the class members, Plaintiff will fairly and adequately protect the interests of all class members.

80. Plaintiff's counsel practice exclusively in consumer protection litigation as it relates to consumer credit issues. Plaintiff's counsel has been certified as class counsel in previous class actions which sought to enforce consumer rights laws.

81. Neither Plaintiff nor his counsel have any interest which might cause them to not vigorously pursue the instant class action lawsuit. Plaintiff and his counsel are committed to expending the time, energy, and resources necessary to successfully prosecute this action on behalf of the Classes.

### 5. Rule 23(b)(3) – Predominance/Superiority

82. A class action is appropriate because the common questions of law and fact common substantially predominate over questions that may affect individual class members. Because all class members had their rights violated in the same manner by the same actions of Defendants, the answer to these common questions will advance the resolution of the litigation as to all class members.

83. A class action is superior to all other available methods for the fair and efficient adjudication of the controversies raised in this Complaint because the costs to pursue individual claims would likely exceed what any one class member has at stake. Thus, members of the Classes have little interest in controlling separate actions when considering the cost, risk, delay, and

uncertainty of recovery in prosecuting these claims.

84. The concentration of litigation of these claims in one forum will permit a large number of similarly situated persons to prosecute their common claims efficiently, without unnecessary duplication of effort and expense that individual actions would engender, and therefore, promote judicial economy.

85. Statutory relief under the FCRA follows from evidence that Defendants provided tenant screening reports relating to the class members that contained public record information after such information had been expunged or sealed – not the subjective or individual experience of any class member.

86. Whether Defendants violated the FCRA can be determined by examination of Defendants' policies and conduct and a ministerial inspection of Defendants' business records and publicly available eviction litigation records.

87. Upon information and belief, few class members are aware that Defendants' actions were unlawful. Thus, the class notice provides an opportunity for uninformed class members to learn about their rights and obtain relief where they otherwise would not have.

88. A class action is appropriate because the prosecution of separate actions for individual class members creates a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for the parties engaged in the provision of tenant screening services. Likewise, the prosecution of separate actions by individual class members would, as a practical matter, be dispositive of the interests of other members who are not parties to the action or could substantially impair or impede their ability to protect their interests.

## COUNT I

## FAIR CREDIT REPORTING ACT-FCRA Section 1681e(b)

89. Plaintiff restates and re-alleges the preceding allegations of this Complaint.

90. Plaintiff brings Count I as a Class Action on behalf of himself, the Failure to Update Class, and the Failure to Update Subclass (Florida Class).

91. Defendants are liable to Plaintiff and the Classes for negligently and willfully failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom a consumer report relates, in violation of 15 U.S.C. § 1681e(b).

92. Specifically, Defendants failed to follow reasonable procedures to assure maximum accuracy of eviction information contained in tenant screening reports prepared about Plaintiff and members of Classes, thereby publishing false, misleading, inaccurate, incomplete, and outdated eviction information to their potential Property Managers.

93. Defendants' conduct violated 15 U.S.C. § 1681e(b).

94. As a result of Defendants' violations of the FCRA, Plaintiff and the Classes are entitled to actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1681n and 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Classes pray for relief as follows:

A. Awarding judgment against Defendants in an amount to be determined at trial;

B. Certifying the Failure to Update Class and the Failure to Update Subclass (Florida) as described herein;

C. Awarding Plaintiff actual damages, statutory damages, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1681n and 1681o against Defendants;

D.  Awarding the Failure to Update Class and the Failure to Update Subclass (Florida) actual damages, statutory damages, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1681n and 1681o against Defendants;

E.  Awarding Plaintiff, the Failure to Update Class, and the Failure to Update Subclass (Florida) any costs, litigation expenses, disbursements, and allowable attorneys' fees; and

F.  Awarding Plaintiff, the Failure to Update Class and the Failure to Update Subclass (Florida)such other and further relief as the Court deems proper, just and equitable.

## JURY TRIAL DEMAND

Plaintiff hereby request and demand a trial by jury.

Dated:  April 8, 2020

Respectfully submitted,

JACK HERNANDEZ, *on behalf of himself*
*And all others similarly situated*

By:   */s/ Craig C. Marchiando*
Craig C. Marchiando
Fla. Bar No. 1010769
**CONSUMER LITIGATION ASSOCIATES**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660
(757) 930-3662 fax
craig@clalegal.com

***Attorney for Plaintiff***